**FOR PUBLICATION**

**UNITED STATES BANKRUPTCY COURT**

**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| In re: | Case No. 20-23726-A-11 |
| AME ZION WESTERN EPISCOPAL DISTRICT, | |
| Debtor. | |

| | |
|---|---|
| AME ZION CHURCH OF PALO ALTO, INC., | Adv. No. 21-2005-A |
| Plaintiff, | WRB-1 |
| V. | **MEMORANDUM** |
| AME ZION WESTERN EPISCOPAL DISTRICT, a California Corporation et al., | |
| Defendants. | |

Argued and submitted on April 21, 2021

at Sacramento, California

Honorable Fredrick E. Clement, Bankruptcy Judge Presiding

Appearances:   Edward D. Johnson, Elspeth V. Hansen, Glenn K. Vanzura, Monique J. Mulcare, Mayer Brown LLP for AME Zion Church of Palo Alto, Inc.; Steven M. Morger, Wendel Rosen LLP for Yosemite Capital, LLC, Roger Wendleken Revocable Living Trust, Brad Evans and Matthew Hill

Subsequent encumbrancers have priority over a prior interest if they gave consideration, acted without notice, and first recorded their interest.  For five decades, AME Zion Church owned, and used, 3549 Middlefield Road, Palo Alto, as a place of worship.  Under false pretenses, AME Zion deeded it to a third party, who then borrowed against it.  The deed was facially irregular, and the church remained in possession of the property.  Did the lenders have notice of the church's interest?

## I.　FACTS

### A.　AME Zion Church of Palo Alto

Founded in 1918, the AME Zion Church of Palo Alto, Inc. ("AME Zion Palo Alto") is among that city's oldest churches.[1]  It serves a "diverse mix of cultures from varying socioeconomic and generational backgrounds."  Compl. 16:16-19, ECF No. 1.  The church has "115 active members, 220 regular in-person congregants" and enjoys a robust internet presence, i.e., 800-1,000 Facebook viewers on an average Sunday.  *Id.*  Its local spiritual head is Pastor-in-Charge Kaloma A. Smith.  AME Zion Palo Alto's principal place of worship is 3549 Middlefield Road, Palo Alto, California ("3549 Middlefield Road").  It is a hierarchical, rather than a congregational, church.[2]

### B.　The African Methodist Episcopal Zion Church

AME Zion Palo Alto is a subordinate part of The African Methodist

---

[1] It is also known as "University AME Zion Church."

[2] "[A] hierarchical church is one in which individual churches are 'organized as a body with other churches having similar faith and doctrine[, and] with a common ruling convocation or ecclesiastical head' vested with ultimately ecclesiastical authority over the individual congregations and members of the entire organized church....In contrast, a congregational church is defined as one 'strictly independent of other ecclesiastical associations, and [one that] so far as church government is concerned owes no fealty or obligation to higher authority."  *Concord Christian Center v. Open Bible Standard Churches*, 132 Cal.App.4th 1396, 1409 (2005).

Episcopal Zion Church ("Denomination").  Governance is shared among the national denomination, districts, and local churches.[3]

The General Conference is the denomination's "supreme legislative body," *Id.,* at 11:10-14.  It meets once every four years.  Between meetings, the Denomination is overseen by the Board of Bishops.

The Denomination is divided into geographic areas, known as "Episcopal Districts."  There are twelve such districts within the United States.  Each district is overseen by a bishop.  Within each district lay leaders, known as "Presiding Elders," act as intermediaries between the local Pastor-in-Charge, the local church, the bishop and the Denomination.  Each Presiding Elder meets regularly with the Pastor-in-Charge and presides over the "Quarterly Conference," which is a once-every-three-month "meeting of the congregation's key leaders and all of its clergy" of each local church.  *Id.,* at 12:12-28. All other local committees and boards, e.g., the Board of Trustees (which is responsible for church property) operate under the direction and in submission to the authority of the local Quarterly Conference.

### C.    The Book of Discipline

The *Book of Discipline* is the governing instrument for laws, plan, polity and process within the Denomination and its authority transcends church hierarchy.

As relevant here, three portions of *The Book of Discipline* govern the acquisition, title, and encumbrance of church properties.  First, real property is held in trust for the Denomination and is subject to

---

[3] The complaint suggests a four-level hierarchy: denomination; regional subdivisions (known as "Annual Conferences"); districts; and local churches. Id., at 11:8-13:2.  At oral argument, plaintiff's counsel described a three-level structure.

Denominational control.

> All assets owned by an African Methodist Episcopal Church, whether incorporated, unincorporated, or abandoned:
>
> (a) Shall be held by the trustees of the church *in trust for the African Methodist Episcopal Zion Church*; and
>
> (b) *Are subject to The [Book of] Discipline*, usage, and ministerial appointments of The African Methodist Episcopal Zion Church, as from time to time authorized and declared by the General Conference of said church.

*The Book of Discipline*, para. 391.4 (2016); Compl., at 14:11-15

(emphasis added).

Second, deeds to church-owned properties must contain a "trust clause," which puts transferees and lenders on notice that the land is held in trust for the Denomination.

> *In trust* that said premises shall be used, kept[,] maintained, and disposed of *as a place divine worship for the use of the ministry, and membership of The African Methodist Episcopal Zion Church in America, subject to the provisions of [T]he [Book of] Discipline*, usage, and ministerial appointments of said church, as from time to time authorized and declared by the General Conference of said church, and by the Annual Conference within whose boundaries the said premises are situated. This provision is solely for the benefit of the grantee, and the grantor reserved (sic) no right or interest in said premises.

*The Book of Discipline*, para. 394 (2016); Compl., at 14:20-25

(emphasis added).

Third, *The Book of Discipline* provides a specific multiple-level approval process for any disposition of church-owned real property.

> The Trustees shall not in any case whatsoever dispose of church property by sale or otherwise [1] *without the consent of the majority of the members in full connection*, [2] *expressed by vote in a meeting called for that purpose, of which due notice has been given.* Provided, however, that no congregation, Pastor, nor trustee board or agent of the congregation shall mortgage or sell any property of The A. M. E. Zion Church [3] *without confirmation of the Quarterly Conference* and [4] *written consent of the Bishop of the district or the Annual Conference.*

*The Book of Discipline*, para. 398 (2016); Compl., at 13:9-12 (emphasis added).

**D.    3549 Middlefield Road**

By quitclaim deed in 1963, AME Zion Palo Alto acquired the raw land on which its sanctuary sits, i.e., 3549 Middlefield Road, Palo Alto, from the Denomination.  That deed did not contain the "in trust" restriction described in *The Book of Discipline.*

AME Zion Palo Alto obtained construction financing and, in 1965-1966, constructed its sanctuary.  Over time, the congregation retired the debt against the property and, since that date, the property has remained free and clear of encumbrances.

From the completion of construction through the present day, AME Zion Palo Alto has occupied the sanctuary, as well as ancillary buildings, located at 3549 Middlefield Road, and has provided spiritual guidance and personal support to persons of faith.

**E.    Bishop Staccato Powell and AME Zion Western Episcopal District**

In 2016, Staccato Powell was selected to head the "Western Episcopal District of The African Method Episcopal Zion Church" ("Western Episcopal District").  *Id.*, at 12:4-11.  The Western Episcopal District is large and extends from southern California to Alaska and also includes Arizona, Colorado, Oregon, and Washington.

Within three months after his ascension, Bishop Powell incorporated an adjunct religious corporation to existing church hierarchy.  Known as the "AME Zion Western Episcopal District" ("the Debtor"), it was not sanctioned by the Denomination and is not coextensive with the district, "Western Episcopal District of The African Methodist Episcopal Zion Church."  Bishop Powell served as the

Debtor's Chief Executive Officer; others served as its subordinate officers.

Bishop Powell taught that congregants and local churches should increase their tithing and should pool their resources as a means of growing the ministry within the district and aiding "struggling churches." Bishop Powell offered a previously unheard of construction of *The Book of Discipline*, which "*required* each local church to sign over its property to the Debtor." *Id.*, at 17:17-19 (emphasis added).

Some churches acquiesced to Bishop Powell's request to sign over church property to this newly created entity; others did not. Not to be deterred, in 2016-2017, Bishop Powell removed each of the Presiding Elders within the district, which in turn precluded convening Quarterly Conferences.

### F.	3549 Middlefield Road Deeded to Bishop Powell's Newly Created Entity and Then Used as Collateral

Bishop Powell pressed AME Zion Palo Alto to transfer 3549 Middlefield Road to his newly created entity, the Debtor, and represented to Pastor Smith that the property would be held in trust. The AME Zion Palo Alto Board of Trustees approved the transfer to the Debtor but did so on the condition that 3549 Middlefield Road "be held in trust" and that the deed specifically contain that restriction *Id.*, at 20:16-19. The transfer was not approved by "consent of the majority of the members in full connection" or by the Quarterly Conference.

In April 2018 Pastor Smith deeded ("the 2018 Deed") 3549 Middlefield Road to the newly created, unsanctioned Debtor, signing his name as "Rev. Kaloma Smith, Chief Executive Officer." That deed was recorded. It did not contain the "in trust" restriction. AME

Zion Palo Alto received no consideration for the deed.

On October 27, 2019, Bishop Powell, acting through the debtor, obtained a $3.64 million loan from Yosemite Capital LLC, Brad Evans, Matthew Hill, and the Roger Wendelken Revocable Living Trust ("the October 27, 2019, Lenders").[4]  That loan was secured by a deed of trust against 3549 Middlefield Road.  AME Zion Palo Alto did not receive any of the proceeds of the October 27, 2019, Loan and, in fact, was unaware of its existence.

### G.    Aftermath

In April 2020, Pastor Smith learned of the problem from a friend of the congregation.

> ...Pastor Smith received a call from a concerned and reliable third party who indicated that (i) there was a mortgage on the property in the amount of $3.6 million dollars, (ii) approximately $11,000,000 in mortgages had been taken on several churches, and (iii) the governing body of the national church, the Board of Bishops, upon learning of Powell's activities, had given Powell until July 24, 2020, to clear all the debt and have in place a process to return the deeds of ownership to each of the local churches.

*Id.,* at 24:16-23.

In July 2020, AME Zion Palo Alto received a Notice of Default for the October 2019 loan; according to that notice the note was past due in the amount of $235,730.00.

In July 2020, the Denomination's Board of Bishops sent a letter to "all AME Zion congregations and clergy" within the Western Episcopal District, stating that "a number of church properties"

---

[4] Actually, 3549 Middlefield Road was used as collateral for three loans, known to the parties as: March 26, Deed of Trust; September 11 Deed of Trust; and October 27, Deed of Trust.  Compl. 21:14-22, 22:1-8, 23:2-15.  The March 26 and September 11 Deeds of Trust were reconveyed, *Id.,* at 22:15-18, Order, ECF No. 63.  As a consequence, it is only the October 27 Deed of Trust that forms the basis of this dispute.

within the district "had been conveyed without approval of duly recorded votes of the local church Board of Trustees, the Quarterly Conference, and an officially called Members Meeting." *Id.*, at 27:4-8. The letter also indicated that some churches had "received foreclosure notices due to delinquent payments, that the Board of Bishops had met with Bishop Powell and that he "promised to bring this situation to an appropriate resolution." *Id.*, at 27:9-14.

In August 2020, the Board of Bishops sent all AME Zion churches within the Western Episcopal District a second, more direct letter, informing them of Bishop Powell's improper conduct. *Id.,* at 27:1-10.

> The procedures used [by Powell] to change local church deeds and convey them to the Western Episcopal District *did not conform to the process described in the AME Zion Discipline*; [and] therefore, it is the position of the Board of Bishops that *all deeds must be restored to the original language and any deed for church property must be consistent with our law.*

*Id.,* 27:15-19 (emphasis added).

A number of the churches who had deeded their properties to the Debtor received notices of default; at least one church lost its property to foreclosure, i.e., AME Zion San Bernardino.

In August 2020, the Board of Bishops relieved Powell of his duties.

**II.  PROCEDURE**

In late July 2020, facing multiple foreclosures, the AME Zion Western Episcopal District filed for Chapter 11 protection. In March 2021, Jeffrey I. Golden was appointed the Chapter 11 trustee.

AME Zion Palo Alto subsequently brought this adversary proceeding against the debtor, its officers, Bishop Staccato Powell, and the October 27, 2019 Lenders. The complaint pleads five causes of action: (1) preliminary and permanent injunction; (2) declaratory relief; (3)

quiet title; (4) rescission;[5] and (5) fraud.[6]

The October 2019 lenders filed a Rule 12(b)(6) motion to dismiss the adversary proceeding against them.  They argue that they are bona fide encumbrancers for value and, therefore, their lien rights trump any interest AME Zion Palo Alto may have against the Debtor.  AME Zion Palo Alto opposes the motion.

**III.  JURISDICTION**

As to the October 2019 Lenders, this court has jurisdiction, 28 U.S.C. §§ 1334, 157 (a), (b) (1); General Order No. 182 of the U.S. District Court for the Eastern District of California, and this is a core proceeding in which this court may enter final orders and judgment, 28 U.S.C. § 157(b)(2)(A), (K); Fed. R. Bankr. P. 7002(2). The crux of core jurisdiction is the October 2019 Lenders $3.992 million secured claim against 3549 Middlefield Road.  Proof of Claim No. 2-1; *In re Washington Coast I, LLC*, 485 B.R. 393, 402-07 (9th Cir. BAP 2012).

Even if the matters raised by this adversary proceeding are non-core, this court may enter final orders and judgment with the consent of the parties. 11 U.S.C. § 157 (c) (1), (2); *Wellness Int'l Network, Ltd. v. Sharif*, 135 S.Ct. 1932 (2015).  Here, AME Zion Palo Alto has consented to the entry of final orders and judgments by this court; the October 2019 Lenders do not consent to the entry of final orders and judgments by this court.

---

[5] At oral argument the plaintiff conceded that the fourth cause of action, i.e., rescission, should be dismissed as to the October 2019 Lenders.
[6] Except the fifth cause of action for fraud, all causes of action are directed to all defendants.  The fifth cause of action is directed against the debtor, the debtor's officers and board of directors, and Staccato Powell. As a consequence, the October 2019 Lenders are not parties to the fraud portion of the action.

**IV.   LAW**

Under Federal Rule of Civil Procedure 12(b)(6), a party may move to dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6), incorporated by Fed. R. Bankr. P. 7012(b). "A Rule 12(b)(6) dismissal may be based on either a lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory." *Johnson v. Riverside Healthcare Sys., LP*, 534 F.3d 1116, 1121–22 (9th Cir. 2008); *accord Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001).

The Supreme Court has established the minimum requirements for pleading sufficient facts. "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. (citing *Twombly*, 550 U.S. at 556).

In ruling on a Rule 12(b)(6) motion to dismiss, the court accepts all factual allegations as true and construes them, along with all reasonable inferences drawn from them, in the light most favorable to the non-moving party. *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001); *Cahill v. Liberty Mut. Ins. Co.*, 80 F.3d 336, 337–38 (9th Cir. 1996). The court need not, however, accept legal conclusions as true. *Iqbal*, 556 U.S. at 678. "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Id.* (quoting *Twombly*, 550 U.S. at 555).

In addition to looking at the facts alleged in the complaint, the court may also consider some limited materials without converting the motion to dismiss into a motion for summary judgment under Rule 56. Such materials include (1) documents attached to the complaint as exhibits, (2) documents incorporated by reference in the complaint, and (3) matters properly subject to judicial notice. *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003); *accord Swartz v. KPMG LLP*, 476 F.3d 756, 763 (9th Cir. 2007) (per curium) (citing *Jacobson v. Schwarzenegger*, 357 F. Supp. 2d 1198, 1204 (C.D. Cal. 2004)). A document may be incorporated by reference, moreover, if the complaint makes extensive reference to the document or relies on the document as the basis of a claim. *Ritchie*, 342 F.3d at 908 (citation omitted).

**V.  DISCUSSION**

    **A.  AME Zion Palo Alto's Right to Recover 3549 Middlefield Road from the Debtor**

Nonprofit religious corporations may bring an action to recover assets held in trust and that were wrongfully transferred to a third party. Cal. Corp. Code § 9412(a)(1)[7]; *see generally* 3 Miller and Starr, *California Real Estate*, Deeds and Descriptions § 8:51 (4th ed. 2020) (enumerating grounds on which a deed regular on its face may be deemed invalid).

Among the attacks that may be leveled against validity is that

---

[7] 3549 Middlefield Road was held in trust for AME Zion Palo Alto. Cal. Corp. Code § 9242(c)(2) ("No assets of a religious corporation are or shall be deemed to be impressed with any trust, express or implied, statutory or at common law unless one of the following applies...(2) Unless, and only to the extent that, the articles or bylaws of the corporation, or the governing instruments of a superior religious body of general church of which the corporation is a member, so expressly provide..."). The Book of Discipline does so provide, "All assets owned by an African Methodist Episcopal Zion Church, whether incorporated, unincorporated, or abandoned: (a) Shall be held by the trustees of the church *in trust* for The African Methodist Episcopal Zion Church..." Compl., at 14:9-16 (emphasis added).

the deed was beyond the powers of the corporation or those acting on its behalf, i.e., ultra vires. *Miners' Ditch Co. v. Zellerbach*, 37 Cal. 543, 578 (1869); *McQuaide v. Enterprise Brewing Co.*, 14 Cal.App. 315, 319 (1910) (written lease); *Aitken v. Stewart*, 129 Cal.App. 38, 42-43 (1933) (note and deed of trust); *Black's Law Dictionary* (11th ed. 2019) ("[Latin "beyond the powers (of)," "Unauthorized; beyond the scope of power allowed or granted by a corporate charter or by law."). In the case of nonprofit religious corporations, California has delineated the reach of the ultra vires defense.

> *Any* contract or *conveyance* made in the name of a corporation *which is authorized or ratified by the board or is done within the scope of authority, actual or apparent, conferred by the board or within the agency power of the officer executing it, except as the board's authority is limited by law other than this part, binds the corporation*, and the corporation acquires rights thereunder whether the contract is executed wholly or in part executory.

Cal. Corp. Code § 9141(b) (emphasis added); *see also* Cal. Corp. Code § 208(b) (general Corporate Law). When corporate officers fail to follow the procedures delineated by § 9141(b) the deed is voidable, and not void. *Michaels v. Pac. Soft Water Laundry*, 104 Cal. App. 349, 363 (1930) (construing Cal. Corp. Code § 208), *overruled in part by Mary Pickford Co. v. Bayly Bros.*, 12 Cal.2d 501 (1939).

Officers of religious corporations are the corporation's agents, and the corporation is bound by their actions if those acts were within their "authority, actual or apparent" or "the agency power of the officer." Cal. Corp. Code § 9141(b). Actual authority may be express or implied. Apparent authority exists where:

> The person dealing with the agent must do so with belief in the agent's authority and this belief must be a reasonable one; such belief must be generated by some act or neglect of the principal sought to be charged; and the third person in relying on the agent's apparent authority must not be

guilty of negligence.

*Associated Creditors' Agency v. Davis*, 13 Cal.3d 374, 399, (1975) (construing Cal. Corp. Code § 208).

Ordinarily, the issue of the authority, actual or apparent, and the scope of the agency power of the person executing it are well within the jurisdiction of this court. See *Miner's Ditch Co.*, 37 Cal. at 578; *Aitken*, 129 Cal.App. at 42-43. Even in disputes involving religious corporations, civil courts have jurisdiction over civil and property rights. *Watson v. Jones*, 80 U.S. (13 Wall.) 679, 722-727 (1871). But civil courts must defer to the church on matters of "religious doctrine." *Concord Christian Center v. Open Bible Standard Churches*, 132 Cal.App.4th 1396, 1409 (2005). When a civil court rules on civil and property questions it "employ[s] " 'neutral principles of law, developed for use in all property disputes,'" as the basis for resolving such disputes, unless this determination depends on the resolution of an ecclesiastical controversy over religious doctrine, practice or polity." *Concord Christian Center v Open Bible Standard Churches*, 132 Cal.App.4th 1396, 1411 (2005), citing *Jones v. Wolf*, 443 U.S. 595, 599, 602-604 (1979); *Presbyterian Church v. Hull Church*, 393 U.S. 440, 449 (1969).

Frequently, the line between those controversies that civil courts may resolve, i.e., civil or property rights, and those they may not resolve, i.e., ecclesiastical questions, is less than clear:

> Difficulties arise when application of the neutral principles approach to a particular dispute requires a civil court to examine the governing documents of a religious organization, such as a church constitution, articles of incorporation, bylaws or instruments of property ownership. *To the extent the interpretation or construction of these documents involves the resolution of*

*a matter of ecclesiastical doctrine*, polity or administration, the civil court must defer to the resolution of the issue by the "authoritative ecclesiastical body."

*Concord Christian Center*, 132 Cal.App.4th at 1411, citing *Jones v. Wolf,* 443 U.S. at pp. 602-606 (emphasis added).

This court believes that resolution of this property dispute between AME Zion Palo Alto and AME Zion Western Episcopal District requires resolution of an ecclesiastical question. The crux of the dispute is proper interpretation of *The Book of Discipline* as to ownership of parish property, i.e., "in trust" for the Denomination, Compl., at 14: 9-16, rather than the district, *Id.*, at 17:15-22, and the process by which a local church authorizes transfer of title, i.e., consent of "the majority of members in full connection" and the Quarterly Conference, *Id.*, at 13:4-13, rather than approval by the Board of Trustees and signature of the Pastor in Charge. *Id.*, at 19:1-7, 20:19-27.

In such instances, the court must defer to the "highest ecclesiastical authority that has decided the point." *Episcopal Church Cases*, 45 Cal.4th 467, 485 (2009). Here, that authority is the Board of Bishops and it has unequivocally stated that "all deeds must be restored" to the transferor church and that future transfers "must be consistent with [church] law." Compl., at 27:15-20. From the express wording the court infers a finding that Bishop Powell, acting through his alter ego, lacked authority, actual and apparent, and that his actions fell outside the agency power of his office. The Board of Bishops' order that the individual church properties "must be restored," suggests that the board considers the 2018 Deed voidable, and not void.

**B.   AME Zion Palo Alto's Right to 3549 Middlefield Road Vis-à-Vis the October 2019 Lenders**

California follows the "first in time, first in right" rule of priorities as applied to real estate transfers and encumbrances. *First Bank v. East West Bank*, 199 Cal.App.4th 1309, 1313 (2011); *Friery v. Sutter Buttes Sav. Bank*, 61 Cal.App.4th 869, 878 (1998); *Reiner v. Danial*, 211 Cal.App.3d 682, 687 (1989); 4 Miller and Starr, *California Real Estate*, Recording and Priorities § 10:1 (4th ed. 2020). The "first in time, first in right" rule has been modified by California's recording statutes, under which subsequent purchasers or encumbrancers gain priority under the "race-notice theory." Cal. Civ. Code §§ 1107, 1214; *First Bank*, 199 Cal.App.4th at 1313.

> Under these 'race-notice' rules, a subsequent purchaser [or encumbrancer] obtains priority for a real property interest by (1) acquiring the interest as a bona fide purchaser for valuable consideration with neither actual knowledge nor *constructive notice* of (2) a *previously created* interest and (3) 'first duly record[ing]' the interest, i.e., recording before the previously-created interest is recorded.

*Id.* (emphasis original).

An unrecorded interest in real property is enforceable between the grantor and grantee and against a stranger who has knowledge or even notice of the prior interest. *RNT Holdings, LLC v. United General Title Insurance Company*, 230 Cal.App.4th 1289, 1296-97 (2014); *California Real Estate* § 10:52.

**1.   Irregularities in the 2018 Deed**

Ordinarily, recorded documents do not impart notice of an upstream ultra vires act of conveyance. *Firato v. Tuttle*, 48 Cal.2d 136 (1957); *First Fidelity Thrift & Loan Ass'n. v. Alliance Bank*, 60 Cal.App.4th 1433 (1998); *Cf. Triple A Mgmt. Co. v. Frisone*, 69

Cal.App.4th 520, 530-31 (1999) (transferee is charged with warning signs in the chain of title).

Knowledge of facts imputes knowledge of the legal significance of those facts. *Triple A Management Co., Inc. v. Frisone*, 69 Cal.App.4th 520, 539 (1999); *Bank One Texas v. Pollack*, 24 Cal.App.4th 973, 981-982 (1994); *California Real Estate* § 10:81.

The 2018 Deed contains two warning signs as to the ultra vires nature of that deed. First, the 2018 Deed was not signed by two church officers. California Corporations Code § 313 provides persons dealing with an entity with a safe haven from the lack of authority defense.

> Subject to the provisions of subdivision (a) of Section 208, *any* note, mortgage, evidence of indebtedness, contract, share certificate, initial transaction statement or written statement, conveyance, or *other instrument in writing*, and any assignment or endorsement thereof, executed or entered into between any corporation and any *other person, when signed by the chairperson of the board, the president or any vice president and the secretary, any assistant secretary, the chief financial officer or any assistant treasurer of such corporation, is not invalidated as to the corporation by any lack of authority* of the signing officers in the *absence of actual knowledge on the part of the other person that the signing officers had no authority to execute the same*.

Cal. Corp. Code § 313 (emphasis added).

Section 313 applies to religious corporations. *Saks v. Charity Mission Baptist Church*, 90 Cal.App.4th 1116, 1140-1142 (2001) (applying § 313 to religious corporations). It insulates transferees from ultra vires attacks on the validity of deeds absent actual knowledge as to the lack of authority of the person executing the deed. *Snukal v. Flightways Mfg., Inc.*, 23 Cal.4th 754, 783 (2000); *Charity Mission Baptist*, 90 Cal.App.4th at 1140.

Here, the 2018 Deed was not signed by two church officers; rather

it was signed by "Rev. Kaloma Smith, Chief Executive Officer."  This signature imputes notice to the 2019 October Lenders that the transfer may not have been authorized.

Second, the 2018 Deed does not contain an attestation of notice to the California Attorney General or a representation of approval of the transfer by church membership at a duly noticed meeting.  Cal. Corp. Code § 9632.  Unlike for-profit corporations, a religious corporation must give the California Attorney General notice of its intent to dispose of all, or substantially all, of its assets.  "A [religious] corporation must give written notice to the Attorney General 20 days before it sells, leases, conveys, exchanges, transfers or otherwise disposes of all or substantially all of its assets unless the Attorney General has given the corporation a written waiver of this section as to the proposed transaction."  Cal. Corp. Code § 9633. Failure to give that notice may result in the invalidity of the deed. *Khmer Buddhist Ass'n. v. Phan*, 2018 WL 4613114 (Cal. Ct. App. September 26, 2018).

Moreover, a religious corporation must obtain the approval of the majority of its members for the disposition of all or substantially all of its assets outside the regular course of business.

> (a) Subject to the provisions of Section 9142, *a [religious] corporation may* sell, lease, convey, exchange, *transfer* or otherwise dispose of *all or substantially all of its assets when the principal terms are*:
>
> (1) *Approved by the board; and*
>
> (2) Unless the transaction is in the usual and regular course of its activities, *approved by the members (Section 5034)* and by any other person or persons whose approval is required by the articles or bylaws either before or after approval by the board and before or after the transaction.[8]

---

[8] Because the complaint did not append the Articles of Incorporation or by Bylaws, the court cannot determine whether those documents incorporate the

17

Cal. Corp. Code § 9631 (emphasis added).

Approved by the members means the majority have a duly held meeting with a quorum in attendance.

> "Approval by (or approval of) the members" means approved or ratified by the affirmative vote of a majority of the votes represented and voting at a duly held meeting at which a quorum is present (which affirmative votes also constitute a majority of the required quorum) or written ballot in conformity with Section 5513, 7513, or 9413 or by the affirmative vote or written ballot of such greater proportion, including all of the votes of the memberships of any class, unit, or grouping of members as may be provided in the bylaws (subdivision (e) of Section 5151, subdivision (e) of Section 7151, or subdivision (e) of Section 9151) or in Part 2, Part 3, Part 4 or Part 5 for all or any specified member action.

Cal. Corp. Code § 5034.[9]

For these reasons California has enacted statutory protections, i.e., § 9632, by which transferees from religious corporations, and those downstream from them, can assure good title.

> *Any deed* or instrument conveying or otherwise transferring any assets of a [nonprofit religious] corporation *may have annexed to it the certificate of the secretary* or an assistant secretary of the corporation, [1] *setting forth that the transaction has been validly approved by the board*, [2] *that the notice, if any, required by Section 9633* [notice to the California Attorney General] has been given and [3] (a) stating that the property described in such deed or instrument is less than substantially all of the assets of the corporation or that the transfer is in the usual and regular course of the business of the corporation, if such be the case, or (b) *if such property constitutes all or substantially all of the assets of the corporation and the transfer is not in the usual and regular course of the business of the corporation, stating the fact of approval thereof by the members* (Section 5034). Such certificate is prima facie evidence of the existence of the facts authorizing such conveyance or other transfer of the assets and conclusive evidence in favor of any purchaser or encumbrancer for value who, without notice of

---

applicable provisions of *The Book of Discipline*.

[9] Contrary to the argument of the October 2019 Lenders at oral argument, the members of AME Zion Palo Alto approved a change in the name of the title hold from "AME Zion Church of Palo Alto, Inc." to "University AME Zion." Compl., at 19:16-21. The membership did not approve a transfer of 3549 Middlefield Road to the Debtor.

any trust restriction applicable to the property or any failure to comply therewith, in good faith parted with value.

Cal. Corp. Code 9632 (emphasis added).

Here, the court infers that 3549 Middlefield Road was substantially all of AME Zion Palo Alto's assets. The 2018 Deed does not append a certificate by the church secretary that notice had been provided the California Attorney General and approved by the majority of the members. Having notice of its absence, they are also charged with the significance of that fact. *Triple A Management Co.,* 69 Cal.App.4th at 539; *Bank One Texas*, 24 Cal.App.4th at 981-982. The legal significance is that the transfer may not have been authorized in the manner mandated by law, Cal. Corp. Code § 9631, and that created a duty of inquiry on the part of the October 2019 Lenders.

For these reasons the court believes that irregularities in the execution of the 2018 Deed fairly put the October 2019 Lenders on notice of the possible existence of an ultra vires transfer.

### 2. Inconsistency between title and possession

In California, a bona fide encumbrancer is held to the "prudent purchaser" standard who is "charged with the knowledge of: (1) nature of property, (2) current use of property, (3) identity of person in possession of property, and (4) relationship between person in possession and person whose interest purchaser intends to acquire." *In re Sale Guar. Corp.*, 220 B.R. 660, 666 (9th Cir. BAP 1998); Cal. Code of Civ. Proc. § 19. The encumbrancer therefore has an affirmative duty to inspect the property to be received as collateral and is charged with the knowledge that a reasonable inspection would reveal. *Preston v. Goldman*, 42 Cal.3d 108, 123 (1986); *Stanford v. City of Ontario*, 6 Cal.3d 870, 882-84 (1972); *Connor v. Great Western Sav. Loan Ass'n*, 69

Cal.2d 850, 865 (1968); *California Real Estate* § 10:84. A reasonable

investigation requires more than a mere examination of title.

> Minimum investigation required. If the public records do
> not disclose the possessor's interest, the subsequent
> purchaser or encumbrancer must investigate to determine
> what rights are claimed or held by the occupant. In most
> cases, a mere examination of the public records probably is
> not a sufficient investigation. *The minimum investigation
> by a prudent buyer or encumbrancer requires an inquiry of
> the occupant about his or her right to possession*. If an
> investigation or inquiry is not conducted, the party
> dealing with the property is held to implied notice of all
> information that a reasonable investigation would have
> disclosed.

*California Real Estate* § 10:84 (emphasis added).

    "Where possession is inconsistent with the interest of the party

from whom purchaser intends to acquire title, the [prudent

encumbrancer] has a duty to inquire about rights of the occupant." *In

re Sale Guar. Corp.*, 220 B.R. at 666; Cal. Code of Civ. Proc. § 19.

"Possession by tenant provides constructive notice to the purchaser of

the lessor's interest in property."  See *Id.* (emphasis added);

California Real Estate § 10:84.

    Here the dispute is a textbook case of imputed notice implied by

an inconsistency between record title and actual possession.  "Whether

or not a particular use and occupation of the premises is of the type

and nature to imply notice is a question of fact to be decided by the

circumstances of each case." *California Real Estate* § 10:84;

*California Packing Corp. v. Lopez*, 207 Cal. 600, 602 (1929); *Keese v.

Beardsley*, 190 Cal. 465, 474 (1923); *Randall v. Allen*, 180 Cal. 298,

301–302 (1919).[10]  The simple point is this: as of April 2018, title to

3549 Middlefield Road was held by the "AME Zion Western Episcopal

---

[10] AME Zion Palo Alto will thus bear the burden of proof on the issue of
notice at trial, *California Real Estate* § 10:84; *High Fidelity Enterprises,
Inc. v. Hull*, 210 Cal. App.2d 279, 281 (1962); *Dreyfus v. Hirt*, 82 Cal. 621,
623–624 (1890); *In re Weisman*, 5 F.3d 417 (9th Cir. 1993).

District," Compl., Exh. B (Grant Deed).  Juxtaposed against title is continuous 50-year occupation of that premises, and use as a house of worship, by "AME Zion Church of Palo Alto" and/or "University AME Zion Church."  The October 2019 Lenders were under a duty to inspect their proposed collateral, i.e., 3549 Middlefield Road, prior to lending. Had they done so, they would have discovered an inconsistency between title and possession.  Had they inquired of AME Zion Palo Alto as to its interest, if any, in that property, they would have learned that AME Zion Palo Alto asserted an ownership interest in the property. For the purposes of a motion to dismiss, facts exist from which the October 2019 Lenders are fairly charged with notice and, as a result, are not good faith encumbrancers.[11]

\

\

\

\

---

[11] Though the court need not reach the question of whether Bishop Powell and/or AME Zion Western Episcopal District's fraud trumps the bonda fide encumbrancer rule, it does not appear so in this case.  The law on this is well settled.  "Generally[,] an instrument procured by fraud cannot be revoked or reformed unless it can be done without prejudice to a bona fide purchaser.  Whether or not a prior instrument obtained by fraud can be relied on by a bona fide purchaser depends on the type of fraud involved, whether the fraud was in the inception or the inducement to obtain the instrument.

Fraud in the inception. When a party is unaware of the nature of the instrument being executed because of the fraud of the grantee or beneficiary, there is fraud in the inception and the document is void and cannot be relied on by a bona fide purchaser....

Fraud in the inducement. When the grantor or trustor knows that he or she is executing a deed or trust deed, but he or she is induced to do so by the false representations or promises of the grantee or beneficiary, there is fraud in the inducement rendering the instrument voidable against the grantee or another with notice, but it can be enforced by a subsequent bona fide purchaser against the grantor or trustor."  *California Real Estate* § 10:73. And it does not appear that fraud in the inducement exited in this case or that the lenders were aware of the impropriety of Bishop Powell's actions.

**VI.   CONCLUSION**

For the reasons set forth herein, the motion will be denied.  The court will issue an order from chambers.

**Dated:** May 03, 2021

Fredrick E. Clement
United States Bankruptcy Judge

# Instructions to Clerk of Court
### Service List - Not Part of Order/Judgment

**The Clerk of Court is instructed to** send the Order/Judgment or other court generated document transmitted herewith *to the parties below*. The Clerk of Court will send the document via the BNC or, if checked _____, via the U.S. mail.

| Attorneys for the Plaintiff(s) | Attorneys for the Defendants(s) |
|---|---|
| **Bankruptcy Trustee** (if appointed in the case) | **Office of the U.S. Trustee**<br>Robert T. Matsui United States Courthouse<br>501 I Street, Room 7-500<br>Sacramento, CA  95814 |
| **All Creditors** | |